**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AEL Asia Express (H.K.) Limited,
        *Plaintiff-Appellant,*

v.

American Bankers Insurance
Company of Florida,
        *Defendant-Appellee,*

American Surety Association,
        *Amicus Curiae.*

No. 99-1697

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Paul W. Grimm, Magistrate Judge.
(CA-98-947-L)

Argued: March 1, 2000

Decided: February 28, 2001

Before WILKINSON, Chief Judge, and WIDENER and
TRAXLER, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Traxler wrote the majority
opinion, in which Chief Judge Wilkinson joined. Judge Widener
wrote a dissenting opinion.

_____

## COUNSEL

**ARGUED:** James Paul Koch, Baltimore, Maryland, for Appellant.
Kenneth Scott Knuckey, SEMMES, BOWEN & SEMMES, Balti-

more, Maryland, for Appellee. Henry P. Gonzalez, CARLOS RODRIGUEZ & ASSOCIATES, Washington, D.C., for Amicus Curiae. **ON BRIEF:** JoAnne Zawitoski, SEMMES, BOWEN & SEMMES, Baltimore, Maryland, for Appellee. Helen M. Cousineau, CARLOS RODRIGUEZ & ASSOCIATES, Washington, D.C., for Amicus Curiae.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

TRAXLER, Circuit Judge:

This case involves a suit on a maritime bond. AEL Asia Express (H.K.), Ltd. ("AEL") appeals the trial court's grant of summary judgment for American Bankers Insurance Company of Florida ("American Bankers"). The trial court held (1) that the maritime bond applied only when Worldwide Transport U.S.A., Inc. ("Worldwide"), the principal, was acting as a non-vessel-operating common carrier ("NVOCC"), and (2) that Worldwide did not act as an NVOCC regarding the shipments in question. We affirm.

### I.

The facts, viewed in a light most favorable to AEL, *see Smith v. Virginia Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996) (en banc), are as follows. AEL is a Hong Kong freight forwarder that on occasion serves as an NVOCC.[1] Acting on behalf of Far East Trading and Orient Express, AEL arranged for the transportation of ceramic pottery from mainland China to the port of Hong Kong. Following delivery of the pottery to Hong Kong, AEL contracted for ocean

---

[1]An NVOCC is a common carrier that arranges for ocean transportation of goods, but does not operate the vessels carrying the goods. *See* 46 U.S.C.A. app. § 1702(17) (West Supp. 1998).

transport, freight collect, to various ports in the United States. Once the pottery was loaded onto the vessels in Hong Kong, AEL employees prepared and sent Worldwide the ocean carrier's bill of lading and a Worldwide bill of lading. AEL also prepared and sent Worldwide a debit note, informing Worldwide of the amount of ocean freight to collect from the ultimate consignee, the amount to pay the carrier, the amount of Worldwide's commission, and the amount due to AEL. For the various shipments, Worldwide performed all of its assigned tasks but one—it did not remit the monies due to AEL.

AEL filed suit against Worldwide in Maryland state court. The state court judge dismissed the complaint on the ground that a forum selection clause in Worldwide's bill of lading provided that controversies between the parties would be adjudicated in federal court. AEL then refiled in the United States District Court for the District of Maryland, eventually obtaining a default judgment against Worldwide in excess of $30,000. With default judgment in hand, AEL turned to Worldwide's surety on a maritime bond,[2] American Bankers, for payment. American Bankers denied the claim, and AEL brought suit against American Bankers in the district court. The district court referred the case to a magistrate judge by consent of the parties for all proceedings. *See* 28 U.S.C.A. § 636(c) (West 1993 & Supp. 1998). Hearing cross-motions for summary judgment after completion of discovery, the magistrate judge denied AEL's motion, but granted that of American Bankers. The judge held that the maritime bond applied only when Worldwide was acting as an NVOCC, and that Worldwide did not act as an NVOCC regarding the shipments in question. AEL appeals.

## II.

This is essentially a case of statutory construction and is therefore reviewed de novo. *See Hartford Ins. Co. v. American Automatic Sprinkler Sys., Inc.*, 201 F.3d 538, 541 (4th Cir. 2000). In the 1990 and 1992 amendments to the Shipping Act of 1984, *see* 46 U.S.C.A. app. §§ 1701-21 (West Supp. 1998), Congress mandated that "[a]

---

[2]The bond, in pertinent part, provides that American Bankers will "pay any judgment for damages against the principal arising from the Principal's transportation related activities." J.A. 33.

bond . . . obtained pursuant to this section shall be available to pay any judgment for damages against a non-vessel-operating common carrier arising from its transportation-related activities under this chapter." 46 U.S.C.A. app. § 1721(b).[3] To trigger the surety's liability to pay a damages award, three elements are required: (1) an NVOCC, (2) engaging in transportation-related activities, (3) under the Shipping Act of 1984. The present dispute deals exclusively with the first element.

### A.

AEL reads § 1721(b) to require the entity, which sometimes acts as an NVOCC, to merely engage in transportation-related activities for the bond to apply. American Bankers, on the other hand, reads § 1721(b) to require the entity to serve as an NVOCC in the relevant transaction for the bond to apply. The principles of statutory construction that we must follow are well settled. According to the Supreme Court:

> Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and "the statutory scheme is coherent and consistent."

> The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.

*Robinson v. Shell Oil Co.*, 519 U.S. 337, 340-41 (1997) (citations

---

[3]As originally passed in 1990, "under this chapter" was not included in the statute. *See* Pub. L. No. 101-595, § 23, 104 Stat. 2979, 2997 (1990). The 1992 amendments added this phrase. *See* Pub. L. No. 102-251, § 201, 106 Stat. 60, 61 (1992). Congress recently amended the Shipping Act of 1984 with the Ocean Shipping Reform Act of 1998 ("OSRA"), which repealed 46 U.S.C.A. app. § 1721. *See* Ocean Shipping Reform Act of 1998, Pub. L. No. 105-258, § 118, 112 Stat. 1902, 1914 (1998). OSRA post-dates this dispute and is not retroactive.

omitted). In considering the pertinent factors, we conclude that the statute is indeed ambiguous. The bond requirement of § 1721, viewed as a whole, reveals a concern that NVOCCs act in a responsible manner, and this concern logically fits into the purpose of chapter 46, which in part endeavors "to provide an efficient and economic transportation system in the ocean commerce of the United States." 46 U.S.C.A. app. § 1701(2). Financial irresponsibility of entities covered by the Shipping Act—such as failing to remit monies due others—certainly would have a deleterious effect on the Act's stated goals. Moreover, § 1721 is the only portion of chapter 46 which specifically targets NVOCCs. Other sections of chapter 46 briefly refer to NVOCCs, or simply include NVOCCs in listings of entities performing maritime services to which the particular section applies. *See* 46 U.S.C.A. app. §§ 1702, 1709, 1710a. Unfortunately, the language of § 1721 and the broader context of chapter 46 shed little light on the precise question presented. General assertions of financial responsibility and brief references to NVOCCs provide the court with few clues. The fact remains that AEL's and American Bankers' interpretations of § 1721(b) are both reasonable and thus we cannot escape the ambiguity. *See Adler v. Commissioner*, 86 F.3d 378, 380 (4th Cir. 1996) (holding statute reasonably susceptible to multiple meanings was ambiguous); *United Servs. Auto. Ass'n v. Perry*, 102 F.3d 144, 146 (5th Cir. 1996) (same).

Once a court determines a statute is ambiguous, it may use various tools to facilitate statutory interpretation, including legislative history, the overall statutory scheme, other relevant statutes, *see Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 162 (4th Cir. 1998), *aff'd,* 120 S. Ct. 1291 (2000), and explanations of the appropriate administrative agency, *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The judiciary, however, "is the final authority on issues of statutory construction." *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843 n.9 (1984).

Turning to the legislative history, we note that Congress enacted the bonding requirement of § 1721 because the Federal Maritime Commission ("FMC") received a plethora of complaints about NVOCC practices. The grievances included "failure to deliver cargo, failure to honor loss and damage claims, and abandonment of cargo at ports throughout the world." H.R. Rep. No. 101-785, at 2 (1990),

1990 WL 200505, at *2. Congress reasoned that the bond "would be available to pay any judgment for damages arising out of an NVOCC's activities *as a common carrier* providing ocean transportation services." H.R. Rep. No. 101-785, at 3 (1990), 1990 WL 200505, at *2 (emphasis added). This reference to "common carrier" appears to relate directly to the statutory definition of NVOCC. Hence, the legislative history points us to the definitional section of chapter 46 and advises close scrutiny of the relevant definitions.

A common carrier is an entity providing waterborne transportation "of passengers or cargo between the United States and a foreign country for compensation that assumes . . . responsibility for the transportation" and operates a vessel on "the high seas or the Great Lakes." 46 U.S.C.A. app. § 1702(6). NVOCC is defined as "a common carrier that does not operate the vessels by which the ocean transportation is provided, and is a *shipper in its relationship with an ocean common carrier.*" 46 U.S.C.A. app. § 1702(17) (emphasis added). Courts frequently describe NVOCCs as "intermediar[ies] between a shipper of goods and an operator of a vessel that carries the goods." *Acess Int'l, Ltd. v. Intercargo Ins. Co.*, 183 F.3d 935, 937 (9th Cir. 1999). Because entities that act as NVOCCs perform duties (*e.g.*, warehouseman and packing agent) unrelated to their roles as common carriers, the House Report apparently took pains to emphasize the bond's applicability to common carriage, which is the core of NVOCC status.

Furthermore, this same concern that drove the House of Representatives is also evident in the FMC's interpretation of § 1721. *See* Bonding of Non-Vessel-Operating Common Carriers, 56 Fed. Reg. 51987, 51991 (1991) (noting that concern was expressed by sureties that entities with multifaceted businesses would fall under the bond's requirement even when the entities were not engaged in ocean common carriage). The explanations of the FMC, the agency entrusted by Congress with the interpretation and application of the Shipping Act, "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore*, 323 U.S. at 140. The FMC has concluded that "[t]he bond covers the transportation-related activities of an NVOCC when acting as an NVOCC. . . . To the extent that someone who operates as an NVOCC also provides non-NVOCC services, those services would not be covered by the bond." Bonding of Non-Vessel-Operating Common Carri-

ers, 56 Fed. Reg. at 51991. In reaching its conclusion, the FMC delved into much of the same legislative history we have examined as well as the pertinent definitions.

Based on the precise statutory definition of NVOCC, the effort in the legislative history to follow the language of the definition, and the FMC's informed judgment, we conclude that the entity must serve as the NVOCC in the relevant transaction for the bond to apply. Only then does the entity act as a shipper in relation to an ocean common carrier, *see* 46 U.S.C.A. app. § 1702(17), and assume the responsibility, *see* 46 U.S.C.A. app. § 1702(6)(A), of "arrang[ing] for transportation of goods from port to port." *NLRB v. International Longshoremen's Assoc., AFL-CIO*, 447 U.S. 490, 496 n.8 (1980). To hold otherwise would transform the bond into a general insurance policy. Congress could have commanded entities that sometimes act as NVOCCs to purchase general liability policies, but it did not. Whereas we believe that Congress sought to ensure that the statutory patch was commensurate with the hole, AEL insists that the patch was intended to cover the entire garment. This we cannot glean with the relevant tools of construction.

### B.

Next, we must decide whether Worldwide was serving as an NVOCC for the shipments of pottery. As discussed above, an NVOCC is a middleman and "a common carrier that does not operate the vessels by which the ocean transportation is provided, and is a shipper in its relationship with an ocean common carrier." 46 U.S.C.A. app. § 1702(17). The record indicates that Worldwide's functions in the questioned transactions were (1) to collect the ocean freight from the ultimate consignee, (2) to pay the carrier, (3) to deduct its commission, and (4) to remit the remainder to AEL. AEL's director and general manager admitted in her deposition that Worldwide's role was limited to collection and distribution of funds, *see* J.A. 286, and in its complaint in the default proceeding AEL described Worldwide as a "consignee." J.A. 65. When questioned at oral argument, counsel for AEL was unable to attribute additional duties to Worldwide. In addition, the vessel-operating common carrier's ("VOCC") bill of lading listed Worldwide as consignee, and listed AEL as the shipper. *See* J.A. 71. This is consistent with AEL's

acknowledgment in its brief that it "arranged for ocean carriage from Hong Kong to various ports in the United States." Brief of Appellant at 8. These facts unequivocally indicate that AEL, not Worldwide, was the "shipper in its relationship with an ocean common carrier," 46 U.S.C.A. app. § 1702(17), and thus AEL was the NVOCC regarding the shipments of pottery. At most, Worldwide acted as AEL's collection agency and did not know of the shipments until they had been loaded onto vessels in Hong Kong. In light of Worldwide's limited knowledge and functions, it could not have served as the NVOCC in the present case.

Notwithstanding this evidence, AEL points to the FMC's new regulations which give examples of NVOCC services. These new regulations, effective May 1999, post-date the dispute between the parties and AEL does not argue that the regulations are retroactive. In essence, AEL appeals to the regulations as persuasive authority. According to 46 C.F.R. § 515.2(l) (1999), the following are examples of NVOCC services:

> (1) Purchasing transportation services from a VOCC and offering such services for resale to other persons;

> (2) Payment of port-to-port or multimodal transportation charges;

> (3) Entering into affreightment agreements with underlying shippers;

> (4) Issuing bills of lading or equivalent documents;

> (5) Arranging for inland transportation and paying for inland freight charges on through transportation movements;

> (6) Paying lawful compensation to ocean freight forwarders;

> (7) Leasing containers; or

> (8) Entering into arrangements with origin or destination agents.

AEL suggests that Worldwide's payment of transportation charges and the issuance of a Worldwide bill of lading demonstrate that Worldwide was acting as an NVOCC. However, an examination of § 515.2(l) buttresses our conclusion that AEL was the real NVOCC in this case. AEL contracted with the VOCC, issued Worldwide's bill of lading, and arranged for the inland transportation in China. As the crux of NVOCC status is acting as "an intermediary between a shipper of goods and an operator of a vessel that carries the goods," *Acess Int'l, Ltd.*, 183 F.3d at 937, the new regulations do not alter our original conclusion that one must be operating as an NVOCC for the bond to apply, and that AEL, not Worldwide, was the NVOCC in the present case.

AEL also adduces the affidavit of Worldwide's president submitted in the state court suit that was dismissed. The affidavit states that "Worldwide Transport agreed to provide services as an NVOCC to [AEL] in consideration for a small commission." J.A. 58. The magistrate judge dismissed the affidavit as "conclusory." J.A. 556. We agree. *See Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (stating that conclusory affidavit cannot defeat summary judgment). As the FMC has observed, when dealing with NVOCCs, "an intermediary's conduct, and not what it labels itself, will be determinative of its status." Bonding of Non-Vessel-Operating Common Carriers, 56 Fed. Reg. at 51991. And Worldwide's conduct was that of a collection agency.

### III.

For the foregoing reasons, we affirm the magistrate judge's grant of summary judgment. The bond mandated by § 1721 applies only when the principal acts as an NVOCC, and Worldwide did not act as an NVOCC regarding the shipments in question.

*AFFIRMED*

WIDENER, Circuit Judge, dissenting:

The decision of the magistrate judge appealed from contains, in my opinion, so many errors as to the admissibility and consideration of

evidence in the case, that I think that fact, at least, requires the vacation of the order appealed from and the remand of the case for further fact finding. This is not to say that I agree with the result, for I do not.